UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| UNITED STATES OF AMERICA | § | |
| --- | --- | --- |
| | § | |
| v. | § | CRIMINAL NO. 4:18-CR-575 |
| | § | (HUGHES) |
| JACK STEPHEN PURSLEY, | § | |
| AKA STEVE PURSLEY, | § | |
| Defendant. | § | |

**GOVERNMENT'S MOTION IN LIMINE
TO PRESENT TESTIMONY AND RECORDS**

The United States, by and through undersigned counsel, submits the following motions in limine. For the reason enumerated below, the Government respectfully requests pretrial determinations to (1) allow summary witness testimony and permit the summary witness to be present during trial; (2) allow the use of demonstrative aids; (3) bar argument or evidence regarding purported government misconduct in the initiation of the present case; and (4) permit the testimony of Lisa Carrillo and Christopher Carrillo and records that support their testimony. For the following reasons, the Government respectfully requests that this evidence be admitted.

**Procedural History**

On September 20, 2018, a grand jury returned a four-count indictment against Defendant Pursley. Count One charged the defendant with conspiracy to defraud the United States, in violation of 18 U.S.C. § 371; Count Two charged the defendant with tax evasion, in violation of 26 U.S.C. § 7201, relating to his individual income taxes for the 2009 tax year; Count Three charged the defendant with tax evasion, relating to his individual income taxes for the 2010 tax year; and Count Four charged the defendant with tax evasion relating to Shaun Mooney's

individual income taxes for the 2010 tax year.[1] The charges relate to Defendant Pursley's participation with Mooney in a scheme to repatriate more than $18 million in untaxed proceeds of Mooney's offshore oil rig employee leasing business, which had been hidden in unreported bank accounts in the Isle of Man. The goal of the scheme was to repatriate the funds in a manner designed to conceal the receipt from the Internal Revenue Service and to enrich Defendant Pursley and Mooney.

Trial is scheduled to begin trial on November 27, 2018.

1. **Motion to Allow Summary Witness Testimony and to Allow Revenue Agent Frasier to Remain in the Courtroom Throughout Trial**

To assist the jury in the examination of bank records and business records, as well as to assist the jury in the relevant income tax calculations, the Government intends to present summary witness testimony. The Government expects to call in its case-in-chief IRS Revenue Agent Michael Frasier. In his anticipated testimony, Revenue Agent Frasier will identify and summarize various transactions involving the defendant and Mooney that appear in the admitted exhibits. Revenue Agent Frasier will also summarize tax-related evidence and introduce computations and schedules reflecting the defendant and Mooney's unreported income. While the Government believes that some of Revenue Agent Frasier's testimony likely does not require his being qualified as an expert, the Government, nonetheless, intends to qualify him as such and has provided appropriate notice to the defendant.

Such summary testimony is routinely admitted in income tax prosecutions. For example, in *United States v. Moore*, the Fifth Circuit found that it was wholly appropriate for an IRS agent to testify as an expert where the agent "testified to facts that were either well within his area of

---

[1] Mooney was identified as Co-Conspirator 1 in the indictment.

2

expertise or were personally experienced by him." *United States v. Moore*, 997 F.2d 55, 58 (5th Cir. 1993) (IRS revenue agents may testify as expert summary witnesses). Put differently, an IRS expert is permitted to summarize and analyze the facts indicating willful tax evasion so long as he does not "directly embrace the ultimate question of whether [the defendant] did in fact intend to evade income taxes." *United States v. Dotson*, 817 F.2d 1127, 1132 (5th Cir. 1987) (vacated in part on other grounds, *United States v. Dotson*, 821 F.2d 1034 (5th Cir. 1987)). If the testimony is limited to these parameters, and an instruction about the weight of the testimony is provided, then the testimony will be "placed in the proper perspective." *United States v. Fogg*, 652 F.2d 551, 557 (5th Cir. 1981).

Revenue Agent Frasier's testimony would be based on evidence admitted at trial. Accordingly, as is standard practice in a federal tax prosecution, the Government will request that Revenue Agent Frasier be permitted to remain in the courtroom throughout the presentation of the evidence pursuant to Federal Rule of Evidence 615. That rule permits a witness to remain the courtroom, even when other witness are sequestered, if the person's presence is essential to the presentation of the Government's case. *See* Fed. R. Evid. 615(c). As the role of a summary witness is to know and summarize the evidence, including properly admitted witness testimony, and further, as the witness's testimony relates only to a summary of records and does not depend on any prior testimony, the underlying rationale for sequestration is absent. *See, e.g.*, *United States v. Strauss*, 473 F.2d 1262, 1263 (3d Cir. 1973) (finding that the purpose for sequestering a witness is "to prevent the shaping of testimony by witnesses to match that given by other witnesses."). Accordingly, Revenue Agent Frasier should be permitted to be present in the courtroom throughout the trial and to present summary testimony.

**2. <u>Motion to Allow Demonstratives/Visual Aids Under Fed. R. Evid. 1006 & 611(a)</u>**

At trial the Government intends to use, in closing argument and during the testimony of its summary witness, visual aids to help explain its case to the jury, based upon the admitted evidence. Specifically, the Government will offer at trial summaries or charts that incorporate complex evidence, such bank deposits and bank flows and tax-related evidence. District courts routinely allow the government to introduce relevant charts and summaries. *See United States v. Scales*, 594 F.2d 558, 563 (6th Cir. 1979). The Fifth Circuit has further affirmed the practice, so long as "(1) the charts are based on competent evidence before the jury; (2) the primary evidence used to construct the charts is available to the other side for comparison in order that the correctness of the summary may be tested; (3) the person who prepared the charts is available for cross-examination; and (4) the jury is properly instructed concerning their consideration of the charts*.*" *United States v. Winn*, 948 F.2d 145, 159 (5th Cir. 1991); *accord United States v. Goodwin*, 470 F.2d 893, 899 (5th Cir.1972). The summaries need not contain a defendant's anticipated evidence. *Myers v. United States*, 356 F.2d 469, 470 (5th Cir. 1966). Copies of the summaries may be used during the testimony concerning them. *See id.* The summaries may even be used during deliberation if requested by the jury. *See United States v. Silverman*, 449 F.2d 1341, 1346 (2d Cir. 1971).

Summaries may be in the form of (1) primary-evidence summaries; (2) pedagogical-device summaries or illustrations; and (3) secondary evidence summaries that are a combination of (1) and (2) in that they are not prepared entirely in compliance with Rule 1006 and yet are more than mere pedagogical devices designed to simplify other evidence in the case. *See United States v. Bray*, 139 F.3d 1104, 1112 (6th Cir. 1998) (extensively detailing the differences between each category).

Primary-evidence summaries that are admissible pursuant to Rule 1006 summarize "voluminous writings, recordings or photographs which cannot be conveniently examined in court. Fed. R. Evid. 1006. The summaries rather than the underlying documents are to be considered evidence. *See* 1 Edward J. Devitt, et al., Federal Jury Practice and Instructions Section 14.02 (4th Cir. 1992) and 1 Leonard B. Sand et al., Modern Federal Jury Instructions (Criminal) Section 5.05 at 5-34 (1997). These documents are properly admissible as evidence without a limiting instruction. *Bray*, 139 F.3d at 1104. The defendant has been provided with notice of the Government's intent to use 1006 summaries and a copy of a draft money-flows summary.

Pedagogical-device summaries or illustrations that clarify or simplify evidence or assist counsel in argument to the jury are admissible pursuant to Federal Rule of Evidence 611(a). *Id.* at 1112-12. A pedagogical device may include information on a drawing, flip chart, summary, graph, or illustrative aids that:

> (1) is used to summarize or illustrate evidence, such as documents, recordings, or trial testimony, that has been admitted in evidence; (2) is itself not admitted into evidence; and (3) may reflect to some extent, through captions or other organizational devices or descriptions, the inferences and conclusions drawn from the underlying evidence by the summary's proponent. This type of exhibit is "'more akin to argument than evidence' since [it] organize[s] the jury's examination of testimony and documents already admitted in evidence."

*Id.* at 1111; *Scales* 594 F.2d 564. These devices are generally not admitted as evidence, and the Court should have given a limiting instruction informing the jury of the summary's purpose and that it does not constitute evidence. *United States v. Campbell*, 845 F.2d 1374, 1381 (6th Cir. 1988). The Government may use pedagogical devices and will request that the Court instruct the jury that these charts, if used, are not evidence but are used only as an illustrative aid.

The final type of summary—secondary-evidence summaries—are a combination of (1) and (2), and are "admitted in evidence not in lieu of the evidence they summaries but in addition

5

thereto, because in the judgment of the trial court such summaries so accurately and reliably summarize complex or difficult evidence that is received in the case as to materially assist the jurors in better understanding the evidence." *Bray*, 139 F.3d at 1112. When this evidence is admitted, a court should instruct the jury that the summary "is not independent evidence of its subject matter, and is only valid and reliable as the underlying evidence it summarizes. *Id.*

The Government intends to introduce all three forms of summaries—(1) primary-evidence summaries; (2) pedagogical-device summaries or illustrations; and (3) secondary evidence summaries that are a combination of (1) and (2)—and submits that such summaries should be admitted.

3. **Motion in Limine to Bar Discussion as to the Onset of the Government Investigation**

In his opposition to the Government's Motion for a Rule 15 Deposition, the defendant made several unsupported allegations regarding the propriety of the initiation of the investigation against him. Even if any of defendant's allegations had factual support, which they do not, they are irrelevant as they do not bear on the issue of any defendant's guilt or innocence. The defendant has only made unsupported allegations in this regard, and has not filed any motion, evidence, or declaration directed to such allegations. Even in case of claims of outrageous conduct, or selective or vindictive prosecution, courts have routinely held that claims of improper motive in investigating and prosecuting a defendant, however framed, are legal issues to be resolved by the trial court rather than factual matters to be argued to the jury. *See, e.g.*, *United States v. Jones*, 52 F.3d 924, 927 (11th Cir. 1995) ("The selective prosecution defense is an issue for the court to decide, not an issue for the jury [because] selective prosecution is a defect in the institution of the prosecution that has no bearing on the determination of factual guilt."); *see also United States v. Luisi*, 482 F.3d 43, 58 (1st Cir. 2007) ("Outrageous government conduct is an issue of law, and it

is the province of the district court—and not the jury—to rule on a defendant's motion to dismiss on that ground."); *United States v. Porter*, 764 F.2d 1, 14 (1st Cir. 1985) (concluding that the district court properly rejected a proposed jury instruction regarding "outrageous government conduct" because it was the court's province to decide whether such conduct fell into the "exceptional category where fundamental fairness require[d] dismissal of an indictment"); *United States v. Regan*, 103 F.3d 1072, 1082 (2d Cir. 1997) (concluding that a claim of selective prosecution was properly resolved by the court rather than the jury because it involves a "defect in the institution of the prosecution," rather than factual innocence" (citation omitted)). Accordingly, the defendant should not be permitted to introduce evidence or argument challenging the propriety of his prosecution. *See, e.g.*, *United States v. O'Brien*, 974 F.2d 1346 (10th Cir. 1992) (unpublished) ("The evidence appellant sought to introduce was relevant only to his selective prosecution argument which had already been denied by the district court as a matter of law. Since the court determined appellant was not the victim of selective prosecution, evidence supporting that claim was irrelevant."). The reasons that the Government began an investigation of Defendant Pursley have no relevance whatsoever in this case and the defense should be precluded from making such or similar arguments to the jury.

4. **Motion to Permit the Testimony and Supporting Records of Lisa Carrillo & Christopher Carrillo**

The Government moves to permit both the testimony of Lisa Carrillo and Christopher Carrillo, as well as records that support their testimony. Such evidence is inextricably intertwined with the present offense and is highly relevant to central issues in the case: the defendant's knowledge, intent and plan. Accordingly, the testimony and records are permissible under the federal rules of evidence.

### a. Factual Background

As alleged in the indictment, Mooney owned and operated a lucrative oilrig staffing business in the Isle of Man called Southeastern Shipping Company ("SES"). After operating SES for many years without any IRS reporting, Mooney decided that he wanted to repatriate his money back to the United States in a manner that permitted him to continue to evade the payment of taxes. Mooney thus solicited Pursley's assistance. From 2007 through 2009, Pursley structured the movement of millions of dollars from bank accounts in the Isle of Man to accounts in the United States, which were held by United States corporations owned by Pursley and Mooney. One of the companies used to receive offshore funds was Gulf States Management Company ("Gulf States"). Gulf States had multiple bank accounts, including Washington Mutual/Chase account XXXX1563-0 ("Account 1") and Charles Schwab account XXXX-1072 ("Account 2") (collectively, "the Accounts"). Pursley was a signatory on both of these accounts.

Pursley structured the transfer of funds to the United States companies owned and controlled by the defendant and Mooney to look like non-taxable investments. In particular, using a nominee company in the Isle of Man called Pelhambridge Limited ("Pelhambridge"), Pursley and Mooney caused Pelhambridge to make bogus stock purchases of stock of their respective United States companies. Pursley and Mooney then directed the funds for the purported stock purchases into domestic bank accounts they controlled, including the Accounts. Some of the relevant transfers into these accounts took place in November 2007. Essentially, the scheme involved using bogus stock purchases through nominee companies, such as Gulf States, to repatriate unreported income. Thus, a critical component of the Government's case is demonstrating Pursley's use and control of Gulf States, and that Pursley knew about and directed the bogus stock purchases through the nominee entities.

At same period of time in which Pursley was illegally repatriating his portion of Mooney's funds from the Isle of Man, Pursley also utilized Gulf States and the Accounts in a business arrangement with Christopher Carrillo and his wife, Lisa Carrillo ("the Carrillos"). The structure of the transaction is similar to that used to repatriate Mooney's funds. Beginning in or about June 2006, Pursley and the Carrillos entered into a business relationship to flip houses that they had renovated. Pursley provided a corporation by the name of Global Publishing Corporation ("Global Publishing"), for which Lisa Carrillo and Pursley's wife, Amber Pursley, were the initial shareholders. According to the Carrillos, the company was capitalized with money from Pursley. The Carrillos did not invest any money into the enterprise. Global Publishing's internal records, however, indicate that a third party by the name of "Jose Carrillo" (no relation) purportedly invested approximately $552,000 (in three tranches in October, November, and December 2006) in exchange for stock in Global Publishing. The Carrillos have never met Jose Carrillo and have indicated that he is not related to them, nor was he involved the renovation or sale of the properties, excepting his purported investment.

In or about October 2007, Global Publishing purchased approximately 88,000 shares of stock for $528,000 in Gulf States. Shortly thereafter, on or about November 8, 2007, Lisa Carrillo, at Pursley's direction, transferred approximately $528,000 to Gulf States' Account 1. These funds were then transferred from Account 1 to Gulf States' Account 2, and were subsequently used in late 2007 to purchase two properties. Importantly, at the time the Carrillo-related funds were transferred to Account 1 in November 2007, that account contained funds from Mooney that had been transferred the same month.

In 2008, the Carrillos and Pursley sold the investment properties for a profit. The proceeds were placed in Account 2, which was again was nominally owned by Gulf States. The Carrillos

then received from Gulf States approximately $115,000, representing their portion of the profit. The remaining funds in Account 2 were later deposited into Pursley's E-Trade account XXXX4096, his IOLTA account at First Bank/Prosperity #XXXX0300, and his account at First Bank/Prosperity XXX11467. The Government is unaware of any repayment of Jose Carrillo. The sale of the properties was not reported to the IRS by Gulf States.

### b. Legal Analysis

Federal Rule of Evidence 404(b) provides that evidence of a defendant's crimes, wrongs, or other acts "is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Fed. R. Evid. 404(b)(1). Rule 404(b) further clarifies, however, that evidence of a crime, wrong, or other act may be admissible for any other purpose, "such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b)(2). Rule 404(b) has no application, however, to evidence of uncharged conduct that is intrinsic to the crime charged. "Evidence of an uncharged offense arising out of the same transaction or series of transactions as the charged offense is not an "extrinsic" offense within the meaning of Rule 404(b), and is therefore not barred by the rule." *United States v. Dula*, 989 F.2d 772, 777 (5th Cir. 1993); *see also United States v. Williams*, 900 F.2d 823, 825 (5th Cir. 1990) ("Other act' evidence is 'intrinsic' when the evidence of the other act and the evidence of the crime charged are '*inextricably intertwined*' or both acts are part of a 'single criminal episode' or the other acts were 'necessary preliminaries' to the crime charged."). For example in *United States v Freeman*, the Fifth Circuit found that evidence of financial transactions comprising an uncharged offense was "inexorably intertwined with the charged scheme," as the uncharged offense "arose out of the same series of transactions, because the funds were co-mingled and used to make lulling payments to investors from both schemes."

*United States v. Freeman*, 434 F.3d 369, 374 (5th Cir. 2005). This is similar to what occurred in the present case.

The defendant utilized the Accounts held under the name of the Gulf States Corporation to facilitate repatriation of Co-Conspirator's offshore money in November 2007 and March 2008, papering over many of these transfer via stock purchase agreements. Similarly, the testimony of the Carrillos and the corroborating records will show that the defendant used the same company, Gulf States, and the same accounts in November 2007 to purchase property with the Carrillos and to later facilitate his and the Carrillos' payouts from their real estate venture. The testimony and records will show that a stock purchase agreement was used to justify the transfer of funds to Gulf States. The use of the same company and the same accounts during the same relevant time frame demonstrates the defendant's dominion and control of the account, which could be an issue in the present case.

Furthermore, because the defendant utilized the same bank account during the same time period, he effectively commingled funds from the Carrillo venture and the funds from Mooney. The flow of funds in the present case is an integral component of the Government's case-in-chief, as the Government will have to demonstrate that the funds received by the defendant were not a return of capital or attributable to third parties. At its most basic, an explanation of the defendant's use and control of Gulf States and its related accounts and the in-flows/out-flows from the associated accounts is inextricably intertwined with the forensic banking analysis that the Government must perform. For this reason, the Government respectfully submits that the testimony of the Carrillos and the related records are intrinsic and admissible.

Although the first sentence of Rule 404(b) is framed restrictively, the rule itself is quite permissive, permitting the admission of other crimes evidence in all but one circumstance–for the

purpose of proving that a person's actions conform to his character. Thus, framed differently, Rule 404(b) is a rule of inclusion, not exclusion. *See Huddleston v. United States*, 485 U.S. 681, 688 (1988); *see also United States v. Higgs*, 353 F.3d 281, 311 (4th Cir. 2003) ("Rule 404(b) is an inclusive rule, admitting all evidence of other crimes or acts except that which tends to prove *only* criminal disposition.") (emphasis added).

While the Government does not believe that the Carrillos' testimony or associated records is character evidence because of its intrinsic quality, even if the evidence did fall under Rule 404(b) it should be permitted as evidence of knowledge, intent, plan, and lack of accident.[2] The Fifth Circuit applies a two-step inquiry when assessing whether extrinsic evidence is admissible. "First it must be determined that the extrinsic offense evidence is relevant to an issue other than the defendant's character. Second, the evidence must possess probative value that is not substantially outweighed by its undue prejudice and must meet the other requirements of rule 403." *United States v. Gurrola*, 898 F.3d 524, 537 (5th Cir. 2018). Both these criteria are satisfied here.

As indicated, the Carrillo evidence reveals that the defendant used the same accounts, the same corporation, and the same stock-purchasing scheme, whereby one corporation purchases stock in another corporation, during precisely the same time period as a means of obscuring his relationship to another income generation activity. This is clear evidence of the defendant's *modus operandi*, as well as his knowledge of and involvement in the charged criminal scheme. It also reveals that the stock purchase arrangement did not happen by accident or happenstance; it was a byproduct of the defendant's direction. The Carrillos will testify as such with respect to the Global

---

[2] The Government filed its 404(b) notice on November 1, 2018. The documents related to the 404(b) issue were provided to the defense with the rest of the discovery.

Publishing transfer. Because the Carrillo-related evidence has multiple legitimate purposes, it satisfies the first prong of Rule 404(b).

As to the second prong, the central concern of rule 403 is whether the probative value of the evidence sought to be introduced is "substantially outweighed by the danger of unfair prejudice." The Fifth Circuit has applied a multi-factor test in assessing evidence under Rule 403 that includes "(1) the government's need for the extrinsic evidence, (2) the similarity between the extrinsic and charged offenses, (3) the amount of time separating the two offenses, and (4) the court's limiting instructions. In addition, we consider the overall prejudicial effect of the extrinsic evidence." *United States v. Juarez*, 866 F.3d 622, 627 (5th Cir. 2017) (internal citations omitted).

Applied here, the Government has a substantial need for the extrinsic evidence as it goes directly to the defendant's knowledge and intent and these are both likely to be key components of the defendant's defense. As explained in Juarez, "Extrinsic evidence has a high probative value when intent is the key issue at trial . . . particularly true when the evidence is necessary to counter [a defendant's] claim that he was merely an ignorant participant." *Id.* (internal citations omitted). Turning to the second and third elements, as detailed above, the extrinsic evidence is highly similar to the charged evidence and occurred contemporaneously. Both of these factors enhance the evidence's probative value. *Id.* Finally, with respect to the evidence's possible prejudicial effect, the proffered evidence is not of the kind typically found to be highly prejudicial as it does not involve violent acts, nor is it greater "magnitude than the crimes for which the defendant is on trial," nor will it "occupy more of the jury's time than the evidence of the charged offenses." *United States v. Hernandez-Guevara*, 162 F.3d 863 872 (5th Cir. 1998). As the probative value of the evidence is substantial and the possible prejudice minimal, and can be mitigated by an appropriate jury instruction, the evidence is admissible under Rules 403 and 404(b).

5. **Conclusion**

For the aforementioned, the United States respectfully requests that the Court grant the above-described motions in limine.

                                      Respectfully Submitted,

                                      RYAN K. PATRICK
                                      United States Attorney
                                      Southern District of Texas

By:    /s/ Nanette L. Davis
          Nanette L. Davis, Senior Litigation Counsel
          Nanette.L.Davis@usdoj.gov
          Grace E. Albinson, Trial Attorney
          Grace.E.Albinson@usdoj.gov
          Sean P. Beaty, Trial Attorney
          Sean.P.Beaty@usdoj.gov
          U.S. Department of Justice, Tax Division
          601 D Street, N.W., Room 7634
          Washington, DC 20004
          (202) 514-8030/616-3311/616-2717

# UNITED STATES DISTRICT COURT FOR THE
# SOUTHERN DISTRICT OF TEXAS
# HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § § | |
| v. | § § | CRIMINAL NO. 4:18-CR-575 (HUGHES) |
| JACK STEPHEN PURSLEY, AKA STEVE PURSLEY, Defendant. | § § § | |

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on November 2, 2018, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

                By:    /s/ Nanette L. Davis
                       Nanette L. Davis, Senior Litigation Counsel
                       Nanette.L.Davis@usdoj.gov
                       Grace E. Albinson, Trial Attorney
                       Grace.E.Albinson@usdoj.gov
                       Sean P. Beaty, Trial Attorney
                       Sean.P.Beaty@usdoj.gov
                       U.S. Department of Justice, Tax Division
                       601 D Street, N.W., Room 7634
                       Washington, DC 20004
                       (202) 514-8030/616-3311/616-2717