UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | § | |
| | § | |
| v. | § | **CRIMINAL NO. 4:18-CR-575** |
| | § | **(HUGHES)** |
| **JACK STEPHEN PURSLEY,** | § | |
| **AKA STEVE PURSLEY** | § | |

**GOVERNMENT'S OPPOSITION TO DEFENDANT'S
RENEWED MOTION FOR JUDGMENT OF ACQUITTAL
AND MOTION FOR NEW TRIAL**

On September 20, 2019, Jack Stephen Pursley renewed his motion for judgment of acquittal under Rule 29(c) and further moved the Court for a new trial under Rule 33. The Court should deny both motions. The Government presented sufficient evidence for a jury to convict Jack Stephen Pursley, and the testimony of Dr. Grace was properly excluded as it would not have been helpful to the jury.

**I.    Procedural History**

On September 20, 2018, a grand jury returned a four-count indictment against Pursley. Count One charged the defendant within Conspiracy to Defraud the United States, in violation of 18 U.S.C. § 371; Count Two charged the defendant with Tax Evasion, in violation of 26 U.S.C. § 7201, relating to his individual income tax return for the 2009 tax year; Count Three charged the defendant with tax evasion, relating to his individual income tax return for the 2010 tax year; and Count Four charged the defendant with tax evasion relating to his co-conspirator's individual income tax for the 2010 tax year. After a four-day trial, on September 6, 2019, a jury found Pursley guilty of all counts.

1

## II. The Court Should Deny Pursley's Renewed Motion for Acquittal

In reviewing a motion for judgment of acquittal, the test is whether, viewing the evidence in the light most favorable to the government, a reasonable minded jury could accept the relevant evidence as adequate and sufficient to support the conclusion of the defendant's guilt beyond a reasonable doubt. Fed. R. Crim. P. 29(a); *United States v. Jeffords*, 491 F.2d 90, 91 (5th Cir. 1974). A conviction may be based on circumstantial evidence. The circumstantial evidence "need not be inconsistent with every conclusion but that of guilt, as long as the circumstantial evidence provides the jury with a basis upon which to find the defendant guilty beyond a reasonable doubt." *United States v. Miah*, 433 F. Supp. 259, 264 (E.D. Pa. 1977). This standard is more than satisfied here.

Pursley's co-conspirator, Shaun Mooney, testified that he repeatedly told Pursley that he had undeclared foreign bank accounts with untaxed income. Mooney testified that he asked the defendant to help him hide his ownership of the company from a compliance officer in the Isle of Man and that he asked him to help repatriate the money to the United States without paying taxes on the funds. Pursley agreed. From 2007 through 2010, Pursley and Mooney transferred the money from the Isle of Man to the United States disguised as "stock purchases" or "investments" by a foreign corporation into U.S. corporations. By using this structure, Pursley and Mooney were able to evade paying taxes on the funds or reporting the funds to the IRS.

Revenue Agent Frazier testified as to the tax loss associated with this conduct. In total, for his part in the scheme, Pursley received $4.8 million in unreported income, resulting in $1.7 million in additional tax due and owing from Pursley. Mooney received $13.4 million in unreported income, resulting in $4.7 million in additional tax due and owing from Mooney.

Mooney's testimony was corroborated by other witnesses and extensive documentary evidence. Most notable was the testimony of Eduard Venerabile, who was the nominee owner of

Southeastern Shipping. Venerabile testified that that he was not the owner of Southeastern Shipping, Pelhambridge, or Australian Partners. He affirmed that he had never told Pursley he was the owner of or an investor in any of those companies. Finally, Venerabile testified that in May 2009, shortly after the Isle of Man compliance officer raised questions as to Mooney's ownership of Southeastern Shipping, that Pursley approached him and asked him to sign dozens of documents to paper the file. Venerabile was later provided with a script for a phone call with the compliance officer.

Rather than cataloguing all of the evidence that it presented in its case-in-chief, the United States highlights below a few subcategories of corroborative evidence. These include: (1) travel records detailing that Pursley and Mooney visited Panama, Isle of Man, and United Arab Emirates together prior to critical events; (2) Pursley's contract for 25% compensation; (3) the KPMG memorandum, which was in Pursley's file, explaining that Mooney was the 100% owner of Southeastern Shipping and that the company was listed as being owned by a Brazilian nominee; (4) the testimony of Foster and York about Mooney and Pursley's inconsistent stories regarding the offshore accounts and the "missing Brazilian;" (5) the ratification agreement and other documents signed by Venerabile to paper his ownership of Southeastern Shipping; (6) the formation and other "investment" records related to the companies used to repatriate the income tax free to the United States; (7) the testimony and documents of Robert Armour, revealing that the Colorado property was a vacation home and not a real estate investment; (8) the corporate tax returns and bank records, which showed assets being written off at the same time as million dollar transfers were made to personal bank accounts controlled by the defendant; and (9) finally, the testimony of Senior Revenue Agent Michael Frazier that the decrease in assets on Gulf States and Four Sevens' tax returns—these were U.S. corporations for which Pursley was the majority

owner—were the byproduct of transfers to Pursley. This evidence amply corroborates the testimony of Mooney, Gillis, and Venerabile, and more than satisfies the legal requirement for tax evasion and conspiracy, especially when viewed in the light most favorable to the government as the law requires.

> A. *The Court Should Reject Pursley's Arguments as to the Sufficiency and Consistence of the Evidence*

In the face of this substantial evidence, Pursley is left arguing on the margins. He first summarily claims that the testimony of Shaun Mooney, Charles Gillis, and Eduard Venerabile were "internally inconsistent." Doc. 229, Pursley's Renewed Mot. Judgment Acquittal, pg. 1-3. As detailed above, the Government believes these witnesses told three strands of the same story. To the extent that there were inconsistencies—and the defendant has not expressly identified any in his filing—the inconsistencies are the byproduct of a story being told from three different vantage points, and the jury was fully capable of weighing the inconsistencies with the various witnesses' credibility. This is the reason why the Court instructed the jury to consider, in weighing the testimony, the witness's "inconsistent statements" and whether the testimony is "supported or contradicted by other evidence." Doc. 220, Jury Ins. at 4. At its core, however, these stories were mutually reinforcing as they revealed Mr. Pursley's knowledge, his centrality to the deals, and his involvement in all aspects of the illegal scheme.

> B. *The Jury May Consider the Testimony of "Interested" Parties*

Pursley next rehashes his prior argument that the three primary witnesses were "interested" parties, and therefore that the Court should disregard their testimony. To be clear, it is not apparent to the Government why Venerabile—apart from his friendship with Mooney—would be considered a "personally interested" party as he did not testify for immunity, personal advantage, or as an accomplice. But leaving this issue aside, Pursley's claim misunderstands the law. Just

4

because a party is interested does not mean that the testimony cannot be considered by the Court or the jury, but rather that the testimony must be treated with care. *See United States v. Bermea*, 30 F.3d 1539, 1552 (5th Cir. 1994) (finding that guilty verdict may be sustained even if supported only by the uncorroborated testimony of a coconspirator, even if the witness is interested due to a plea bargain or promise of leniency).

Here, the Court properly instructed the jury that they should consider whether a witness has an "interest in the outcome of the case." Doc. 220, Jury Ins. at 4. The Court further advised the jury that a witness, who testifies for "immunity from punishment" or "for personal advantage," as is the case with Mr. Mooney and Mr. Gillis, are "personally interested" and "must always be examined with great caution." *Id.* This cautionary instruction properly advised the jury as to the law and as to the proper treatment of this testimony. Equally important, Pursley had a full opportunity to cross-examine the witnesses as to their interest and bias and to raise the issues. As the jury was properly instructed and fully capable of evaluating the witnesses and the substantial corroborating evidence, the Court should deny the motion for acquittal.

### III. The Court Should Deny Pursley's Motion for a New Trial

On September 20, 2019, Pursley also moved the Court for a new trial arguing that the Court erred in excluding the testimony of Dr. Stephen Grace. Rule 33 of the Federal Rules of Criminal Procedure provides that "the court may vacate any judgment and grant a new trial if the interest of justice so requires." This standard is not met here. As the Court determined, the testimony of Grace would not have been helpful to the jury and would have caused more confusion than assistance. Moreover, the Court provided clarifying jury instructions, as explained below, on several matters, which covered the same subjects as Grace's offered testimony. As such, the Court properly

exercised its gatekeeper function in restricting his testimony, and the Court should reject Pursley's motion for a new trial.

In his pre-trial submissions to the Court, Pursley claimed that he needed Grace to testify on roughly four different subject areas. The first opinion related to the use of special purpose entities and that their use was not inherently fraudulent. Doc. 192, Aff. Stephen Grace at p. 4-5. The Court addressed this precise concern in the pre-trial conference by noting that it would add a special jury instruction explaining that there is nothing inherently wrongful about the use of corporate entities. The final instruction read: "Owning, using, or creating multiple businesses - at home or abroad - is no indication, by itself, of any sort of wrongdoing." Doc. 220, Gen. Ins. at 3. The defendant approved this instruction. As the instruction effectively covered the same ground, Grace's testimony on this area was not necessary.

The next subject of Grace's testimony would have been that Four Sevens and Diversified had substantial value because of Pursley's business plan, which purportedly incorporated a real-estate auction approach involving Schrader Westchester. Doc. 192, Aff. Stephen Grace at p. 4. While Grace did not have first-hand knowledge of the plan, Scott Schulman did and he testified. *See* Doc. 194, Aff. Scott Schulman, pgs. 3-5. Schulman stated that he and Pursley discussed real estate, a possible venture, and exchanged leads. He also clarified, however, that they did not purchase *any* property together. Thus, this is another area in which the Court properly restricted the testimony to the knowledge of first-hand witnesses as to what actually happened rather than permitting unreliable and speculative testimony of a technician.

The Court also provided jury instructions clarifying that it is not uncommon for new companies to be undercapitalized when formed or to not have revenue. As the Court informed the jury:

> 3. Most businesses originate with insufficient capital. They dilute themselves to get enough capital to do what they were formed to do . . .
>
> 6. That a business has no revenue does not mean it does bad acts.

Doc. 221, Special Jury Ins. pg 5. Both of these instructions go to the same core matter as Grace's offered testimony—that there is nothing inherently fraudulent or wrongful about undercapitalized companies that have minimal revenue as start-up—and thus obviated the need for his testimony.

The final subject matter of Grace's testimony was the purported legitimacy of loans to Pursley. As Mr. Vital explained at the pre-trial motion hearing, the defense intended for Grace to testify that that the "loans *appeared to be* legitimate based upon what was going on with the credit markets and based on the underlying documents." Aug. 22. 2019 Tr. pgs. 22:24-25 to 23:1-2 (emphasis added). In response, the Court correctly noted that the legitimacy of a loan is not determined by macroeconomic forces but by the specifics of the loan itself. As the Court explained, "[a] loan is legitimate, whether the credit market is doing something or not, depending on its documentation and its disbursement . . . We're not going to have mini editorials on who should have done what to the economy, and that it was only because of contraction in real estate." *Id.* at 23:3-8. The Court again correctly focused on what actually happened and what the records showed. The jury did not need a technician, who had no first-hand knowledge of the matter, to explain who formed what corporation or for what purpose. *See Taylor v. Evans*, 1997 WL 154010, at *2 (S.D.N.Y. Apr.1, 1997) (rejecting portions of technician report on the ground that the testimony consisted of "a narrative of the case which a lay juror is equally capable of constructing").

This is especially true given that Grace's testimony as to the "legitimacy" of the loans appears to have been based predominantly upon what Pursley knew, thought, or wanted, rather than the documents themselves. This is apparent from the language used by Grace in an earlier filing to describe his opinions and the bases for his opinions:

7

> *Mr. Pursley's experience* pointed to the need for his operation to have access to equity and possibly debt financing . . .
>
> *From Mr. Pursley's vantage point*, the GSMC equity investments by DLH, formed in May 2007, were unremarkable and followed customary and normal guidelines . . . .
>
> Mr. Pursley, throughout, *sought* to loan, invest, and/or manage the funds in FSIC in a productive manner consistent with customary and normal investment practices. . . .
>
> Pursley operated legal entities in furtherance of his background in real estate *to secure reasonable returns* on capital.
>
> The Government has disregarded and mischaracterized legitimate investments and loans that, *from Mr. Pursley's perspective*, were unremarkable made to (a) deploy capital towards and into real estate markets . . . .

Doc. 89-2 at 2-8. Technicians are only permitted to rely upon hearsay if "experts in the field reasonably rely on such evidence in forming their opinions." *United States v. Mejia*, 545 F.3d 179, 197 (2d Cir. 2008). Self-serving hearsay by a defendant, particularly as to his own mental state, hardly qualifies, which is why courts commonly decline to permit technicians to testify as to such matters. *See, e.g.*, *United States v. Tipton*, 269 F. App'x 551, 560 (6th Cir. 2008) (no error to exclude technician's testimony based solely on self-serving statements.)

The Court is afforded substantial deference as a gatekeeper of expert testimony. *United States v. Salazar*, 440 F. App'x 400, 406 (5th Cir. 2011). Here, the Court properly acted to prevent unnecessary confusion and the presentation of evidence that would not have been helpful to the jury. As this was entirely proper, the interests of justice do not require a new trial.

**IV.     Conclusion**

For all of the foregoing, the Court is respectfully urged to deny the defendant's renewed motion for acquittal and motion for a new trial.

>RYAN K. PATRICK
>United States Attorney
>Southern District of Texas
>
>
>_____/s_____
>By: /s/ Jack A. Morgan
>Jack Morgan, Trial Attorney
>Jack.A.Morgan@usdoj.gov
>Grace E. Albinson, Trial Attorney
>Grace.E.Albinson@usdoj.gov
>Sean P. Beaty, Trial Attorney
>Sean.P.Beaty@usdoj.gov
>U.S. Department of Justice, Tax Division
>601 D Street, N.W., Room 7634
>Washington, DC 20004
>(202) 353-7580/616-3311/616-2717

9

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | § | |
| | § | |
| v. | § | **CRIMINAL NO. 4:18-CR-575** |
| | § | **(HUGHES)** |
| **JACK STEPHEN PURSLEY,** | § | |
| **AKA STEVE PURSLEY,** | § | |
| **Defendant.** | § | |

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

By:   /s/ Jack A. Morgan
Jack Morgan, Trial Attorney
Jack.A.Morgan@usdoj.gov
Grace E. Albinson, Trial Attorney
Grace.E.Albinson@usdoj.gov
Sean P. Beaty, Trial Attorney
Sean.P.Beaty@usdoj.gov
U.S. Department of Justice, Tax Division
601 D Street, N.W., Room 7634
Washington, DC 20004
(202) 353-7580/616-3311/616-2717