**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | § | |
| | § | |
| v. | § | **CRIMINAL NO. 4:18-CR-575** |
| | § | **(HUGHES)** |
| **JACK STEPHEN PURSLEY,** | § | **FILED UNDER SEAL** |
| **AKA STEVE PURSLEY** | § | |

### THE GOVERNMENT'S SENTENCING MEMORANDUM

From March 2007 through May 2013, Steve Pursley committed a brazen tax offense. He designed a complex scheme to defraud the United States out of more than $6 million dollars in tax revenue by disguising the repatriation of more than $18 million in unreported, offshore income as legitimate stock purchases. To cloak the fraud and give it a veneer of legitimacy, Pursley took extensive steps. He used his status and knowledge as an attorney to mislead accountants, attorneys, and a compliance officer. He further caused to be created six nominee companies, and papered transactions with reams of fraudulent records, including promissory notes, private placement memoranda, and tax returns. His decision to commit these crimes and his meticulous efforts to carry out the fraud were not impulsive or the result of desperation, necessity, or financial hardship. They were the calculated decisions of a professional, who believed that he was above the law.

Pursley continues to show the same disdain for the law. He has not taken any responsibility for his crimes, nor has he shown any remorse for what he did. Instead, he paints himself as blameless victim of some far-flung plot, ignoring the volumes of evidence and testimony that revealed his singular role as the architect of the scheme. Equally telling, since his conviction, Pursley has waged a scorched-earth campaign against the government's trial witnesses: demanding depositions in his civil lawsuit with Shaun Mooney of witnesses that testified against him at trial. Pursley's unwillingness to acknowledge his wrongdoing suggests there is little hope that his conviction will deter future criminal

1

conduct. Under these circumstances and given the critical importance of general deterrence in preventing tax offenses, the Court should impose a significant sentence that sends a strong deterrent message, reflects the seriousness of Pursley's crimes, and provides just punishment. Accordingly, the United States asks the Court to impose a within-guidelines sentence of 151 to 188 months in prison.

## I.    Procedural History

On September 20, 2018, a grand jury sitting in the Southern District of Texas returned an indictment charging Pursley with one count of conspiracy to defraud the Internal Revenue Service ("IRS"), in violation of 18 U.S.C. § 371, and three counts of tax evasion, in violation of 26 U.S.C. § 7201. (Doc. 1). After a three-day trial, on September 6, 2019, the jury convicted Pursley on all counts.

## II.    Trial Evidence

The evidence adduced at trial established that from 2007 to 2010 Pursley conspired with Shaun Mooney to move $18 million from secret bank accounts in the Isle of Man to the United States in a manner to evade income taxes. At the core of the scheme was a simple lie: that Brazilian citizen Eduard Venerabile, not Shaun Mooney, was the owner and operator of the lucrative oil-rig staffing business, Southeastern Shipping ("SES"), and as such, that U.S. income taxes were not owed on any income. As revealed by travel records and witness testimony, Pursley knew as early as 1999 that Shaun Mooney was the true owner of SES because Pursley facilitated the company's incorporation in Panama.

In 2001, Mooney reincorporated SES in the Isle of Man with the help of Isle of Man Financial Trust Limited ("IOMFTL"), a financial planning company located in the Isle of Man. To effectuate the change, Mooney worked with IOMFTL employees Andrew Thomas, Andrew Mellor, and Nigel Tebay, and he testified that he told them he was the true owner of SES. At the suggestion of Andrew Thomas, Mooney registered the company under Venerabile's name, to evade U.S. taxes. Kerry Smith corroborated Mooney's testimony, stating that everyone at IOMFTL believed that Mooney was the

2

true owner of SES and treated him as such until 2009, when the defendant began interacting with Ms. Smith.

In 2007, Mooney decided to repatriate to the United States some of his untaxed earnings. To obtain assistance in doing so, Mooney turned to Pursley, revealing to Pursley that he (Mooney) was the owner of SES. In exchange for his assistance, Pursley demanded 25% of the funds he moved back—an arrangement to which Mooney agreed. Pursley devised a scheme to transfer the money to the United States through a series of fake stock purchases in "real estate" investment companies that Pursley and Mooney set up. The stock purchases were smoke screens to disguise that the funds were actually untaxed income to Mooney and Pursley. (Govt. Exs. 1-9, 1-13, 1-23, 1-29, 1-44, 1-83, 1-129). Mooney testified that Andrew Thomas and Andrew Mellor participated in creating this smoke screen by attending a meeting in Texas with Mooney and Pursley, where they created a paper trail intended to make it appear as if the companies contemplated actual real estate investments. In fact, no real-estate investments ever came to fruition. This was a ruse.  (Def. Ex. 32).

After the money was transferred to the U.S. corporations, it was distributed to accounts and entities controlled by Pursley and Mooney. Pursley used his own domestic corporation, Gulf States Management Corporation ("Gulf States") to receive his cut of the proceeds under the guise of a stock purchase from Diversified Land Holdings Inc. ("Diversified"), Mooney's company. Pursley received approximately $900,000 from this first tranche of money, while Mooney received approximately $1,900,000. (Gov't Ex. 36-1). Neither Pursley nor Mooney reported or paid taxes on these funds.

In early 2009, IOMFTL's compliance officer, Smith, became concerned that Mooney, and not Venerabile, was the true beneficial owner of SES. Mooney met with Smith in early April 2009, and during this meeting Smith insisted that Mooney declare his ownership of SES on his tax returns and pay U.S. taxes on the income he earned or cease working with IOMFTL. Mooney testified that, after this meeting, he flew back to the United States and immediately sought Pursley's assistance in hiding

his ownership from Smith and in repatriating his remaining money to the United States. Pursley demanded and received, as payment for his assistance, 25% of the funds he moved to the United States, 25% ownership in the U.S. iteration of SES, Recruitment Partners Limited Partnership ("RPLP"), and 25% of RPLP's future profits. (Gov't Ex. 1-31).

Shortly after Smith's meeting with Mooney, Pursley undertook extensive steps to paper the file and make it appear as if Venerabile was the owner of SES. First, he flew to the Isle of Man to meet with Smith. At that meeting, Pursley told Smith that Venerabile was the true owner of SES, and provided her with a memorandum from a Houston attorney, Thomas Foster, asserting this to be the case. (Gov't Exs. 2-22, 1-35). Evidence at trial proved that Pursley was the actual author of the Foster memorandum. (Gov't Exs. 8-16, 8-9, 1-35). Pursley also presented Smith with extensive documentation signed by Venerabile, relating to his purported ownership of SES. *See e.g.,* Gov't Exs. 5-3, 5-15. Venerabile testified that he did not read or understand the documents, and that he signed them because he trusted Pursley and Mooney, and because Pursley told him that he was acting as Venerabile's attorney. Venerabile also testified that at the time Pursley approached him, he was working on oil rigs in Africa, and that shortly thereafter he told Pursley he was under financial distress and that he was "broke."[1] Pursley also arranged a call and meeting between Venerabile and Smith to effectuate the fiction that Venerabile was the owner. The call took place on May 28, 2009, from a hotel room in Dubai. Both Pursley and Mooney were present for the phone call, as evidenced by their travel records and Mooney's testimony. For the call itself, Mooney provided Venerabile with a script

---

[1] Venerabile also testified that he never told Pursley that he was the owner of SES. Despite this and the evidence that Mooney told Pursley that he (Mooney) was the owner of SES *and* provided him with a record from an international accounting firm again stating that Mooney was the owner, see Gov't Ex. 1-169, Pursley persists claiming that his and Smith's "mutual goal," was to ascertain the beneficial ownership of SES. (Def. Obj. PSR at pg. 3). The jury plainly rejected this contention.

that dictated the false narrative Venerabile should relate to Smith. (Gov't Ex. 1-97). Following the call, on September 22, 2009, Pursley arranged for Venerabile, Mooney, and himself to fly to the Bahamas to meet with Smith. The ostensible goal of the in-person meeting was to prove to Smith that Venerable was a real person and the owner of SES. (Gov't Ex. 1-51). The records, call, and meeting orchestrated by Pursley satisfied Smith, but Pursley still needed to transfer Mooney's remaining funds to the U.S. without paying taxes on the money.

To bring this about and to give the transfers the patina of propriety, Pursley consulted with three tax attorneys. First, Pursley and Mooney met with attorney Bill York, who testified at trial that he met Pursley and Mooney once on April 16, 2009.  At that meeting, Pursley and Mooney told York that a "Brazilian" was the owner of SES, but he had "disappeared." York testified that he did not find their story credible, and he rejected them as clients. The very next day, Pursley and Mooney met with attorney Tom Foster. He testified that Pursley and Mooney told him nothing about Venerabile disappearing, but instead told him that Venerabile was the owner of SES and presented him with one document reflecting such ownership. Foster also testified that, although he authored a memorandum describing the ownership of SES based on the information provided to him by Pursley, Pursley re-wrote Foster'ss memorandum and asked Foster to sign it. (Gov't Exs. 8-16, 8-9, 1-35).

Finally, Mooney and Pursley settled on Houston-based tax attorney Charles Gillis. Gillis testified that 90% of his contact was with Pursley, and that he (Gillis) came up with three separate plans in order to move the funds back to the United States. Each of the plans involved either the payment of taxes or the reporting of the transaction to the IRS. Pursley rejected them all. Instead, Pursley devised a stock purchase scheme, pursuant to which a foreign company would "invest" money in U.S. companies. Because the money was purportedly a foreign investment, it would be deemed a non-taxable transaction. This is the same scheme Pursley used to disguise the earlier transfers in 2007.

Gillis then set up U.S. companies owned by Pursley and Mooney that were used to receive the funds from the Isle of Man. Gillis additionally created an Australian holding company that would appear to be making legitimate investments into Pursley and Mooney's United States companies. Gillis testified that the Australian company had no employees and no bank account, and that the funds never flowed through Australia. (Gov't Ex. 36-1). Instead, the funds were transferred from the Isle of Man to Gillis's IOLTA (Interest on Lawyer's Trust Account) in Texas before being distributed to the bank accounts held by Pursley and Mooney's U.S. corporations. Gillis testified that it was Pursley's idea to direct the money through his IOLTA.

Pursley attempted to make the U.S. companies appear legitimate by falsely claiming that they were created for investing in real estate. In reality, all of the money in Pursley and Mooney's companies went to their personal benefit, tax-free. For example, on August 2, 2010, Pursley purchased a house in Vail, Colorado for $900,000, in the name of Arosa Partners, LLC ("Arosa Partners"), an entity Pursley owned. In 2011, Pursley transferred $1,395,786 from a Four Sevens bank account to his personal E-Trade account, and reported this on the Four Sevens tax returns falsely as a tax-free return of capital. (Gov't Exs. 36-3, 17-23).

From 2007 through 2010, Pursley received $4,825,000 million for assisting Mooney in the scheme. During these years, Mooney received $13,479,488 from SES's accounts. (Gov't Exs. 36-13, 36-14). Pursley continued to conceal the scheme and his receipt of income by deceiving his accountants and the IRS. Certified Public Accountants Greg Bratcher, Jon Hurt, and Harold Christmann all testified that Pursley never revealed to them that the money coming into his domestic corporations had not been previously taxed, and all opined that, had they known the true facts, the transfers should have been reported as income.

Ultimately, the easiest accounting of the cost of Pursley's machinations is the tax loss to the United States. As calculated at trial by Senior Revenue Agent Frazier, Pursley's scheme resulted in a

$6.4 million tax loss. But there are other costs as well. The time, effort, and substantial expenditures by the United States to unwind the complex scheme and to present the evidence at trial. More abstract, but equally damaging, as discussed below, are the systemic costs.

## III.    Guidelines Calculation

### A.    *Probation Office's Calculation*

The government agrees with the Probation Office's guidelines calculations that the correct guideline range is 151 to 188 months imprisonment and addresses that analysis together with the defendant's challenges below. (Presentence Investigation Report ("PSR"), ¶ 80)

### B.    *Tax Loss*

As calculated by the government technician, Senior Revenue Agent Frazier, at trial, the tax loss in this case is $6,497,590, as depicted below:

| Tax Year | Individual | Unreported Income | Tax Due and Owing |
|----------|-----------|-------------------|-------------------|
| 2007 | Jack Stephen Pursley | $600,000 (Gov't Ex. 36-13) | $221,725 (Gov't Ex. 36-14) |
| 2008 | Jack Stephen Pursley | $300,000 (Gov't Ex. 36-13) | $106,182 (Gov't Ex. 36-14) |
| 2009 | Jack Stephen Pursley | $3,625,000 (Gov't Ex. 36-13) | $1,349,217 (Gov't Ex. 36-14) |
| 2010 | Jack Stephen Pursley | $300,000 (Gov't Ex. 36-13) | $111,629 (Gov't Ex. 36-14) |
| 2007 | Shaun Mooney | $361,000 (Gov't Ex. 36-10) | $125,478 (Gov't Ex. 36-11) |
| 2008 | Shaun Mooney | $1,555,000 (Gov't Ex. 36-10) | $539,406 (Gov't Ex. 36-11) |
| 2009 | Shaun Mooney | $0 (Gov't Ex. 36-10) | $0 (Gov't Ex. 36-11) |
| 2010 | Shaun Mooney | $11,563,488 (Gov't Ex. 36-10) | $4,047,221 (Gov't Ex. 36-11) |
| **Total** | | | **$6,500,858** |

In his objections to the PSR, Pursley claims that some of the money transferred to Mooney was income to him (Mooney) earlier than 2007 and therefore must have been taxable to him in an earlier year. (Doc. 245, p. 5). Upon this questionable premise, Pursley then concludes that the tax loss cannot be attributable because of statute of limitations concerns. *Id.* There are multiple flaws in this chain of reasoning. First is the simple fact that Pursley raised this argument at trial and it was rejected. The government presented technician testimony that the transfers were income when the funds were repatriated to the United States. Even were this not the case, Pursley was charged not just with tax evasion but also with conspiring to defraud the IRS. Surely his extensive later efforts to hide untaxed income from the IRS, even if that income relates to an earlier tax year, as he suggests, would constitute relevant conduct for purposes of the guidelines. This is precisely why the guidelines specify that "[i]n determining the total tax loss attributable to the offense . . . *all conduct* violating the tax laws should be considered as part of the same course of conduct or common scheme or plan unless the evidence demonstrates that the conduct is clearly unrelated." U.S.S.G. 2T1.1 Cmt. 2 (emphasis added). Here, given the defendant's extensive efforts to facilitate tax evasion, as well as his involvement in a conspiracy to defraud the IRS, all of the tax loss attributable to the repatriation scheme is relevant conduct.

### C.   *Pursley used sophisticated means to commit his crimes*

The Probation Office correctly assessed a two-level enhancement for use of sophisticated means pursuant to U.S.S.G. § 2T1.4(b)(2). As the commentary explains, "'sophisticated means' means "especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense. Conduct such as hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts ordinarily indicates sophisticated means." U.S.S.G. § 2T1.4, cmt. (n. 3). Pursley meets all of these criteria. He designed *and* executed over a multi-year period a scheme to repatriate untaxed offshore income by hiding the transfers as fake stock

purchases. He created or had created multiple foreign and domestic companies that had no business purpose to hide his and Mooney's receipt of the untaxed income. He transferred or had transferred funds from Mooney's offshore accounts to the same corporations, again disguised as fake stock purchases. He transferred the funds through intermediary corporations and used Gillis's IOLTA to disguise the sender of the funds and to make the transactions appear legitimate. This is the quintessential conduct covered by the sophisticated means enhancement. Moreover, the background comments to the guidelines elucidate that this enhancement is meant to deter especially clandestine conduct, stating, "Although tax evasion involves some planning, unusually sophisticated efforts to conceal the evasion decrease the likelihood of detection and therefore warrant an additional sanction for deterrence purposes." U.S.S.G. § 2T1.1, backg'd. Pursley's crimes were so well concealed that they only came to light after his co-conspirator entered into the Offshore Voluntary Disclosure.

D.    ***Pursley failed to report the source of income exceeding $10,000***

The Probation Office applied a two-level enhancement pursuant to U.S.S.G. § 2T1.1(b)(1) for failing to report or correctly identify the source of income exceeding $10,000 in any year from criminal activity. (PSR, ¶ 47). This enhancement is appropriate because the fees that Mooney paid Pursley to carry out the scheme undoubtedly consisted of income from a criminal activity.

E.    ***Pursley used his skill and training as an attorney to defraud the United States[2]***

The Probation Office correctly assessed a two-level enhancement pursuant to Section 3B1.3 of the U.S. Sentencing Guidelines, which provides for a two-level enhancement if the defendant "abused a position of public or private trust, or used a special skill, in a manner that significantly

---

[2] The Guidelines do not proscribe the joint application of sentencing enhancements both for the use of sophisticated means and the use of a special skill. *See United States v. Olis*, 429 F.3d 540, 549 (5th Cir. 2005), *citing United States v. Calbat*, 266 F.3d 358, 363 (5th Cir. 2001) (upholding the application of both enhancements).

facilitated the commission or concealment of the offense." U.S.S.G. § 3B1.3. In this case, either prong of the enhancement applies.

The application notes state that "the position of public or private trust must have contributed in some significant way to facilitating the commission or concealment of the offense (*e.g.*, by making the detection of the offense or the defendant's responsibility for the offense more difficult)." Attorneys, by definition occupy a position of public trust. *United States v. Harrington*, 114 F.3d 517, 519 (5th Cir. 1998). Here, Pursley leveraged his position as an attorney to facilitate the commission of the conspiracy. He used his status as an attorney to gain the trust of Venerabile, Smith, Foster, and Gillis, which was instrumental to his facilitation of the offense. Pursley additionally used his legal acumen and "special skills" as a lawyer to conceal his crimes by designing the transactions to appear legitimate and then by later papering the transactions with false records. *United States v. White*, 972 F.2d 590, 601 (5th Cir. 1992), *citing* U.S.S.G. § 3B1.3, cmt. (n. 2) ("Clearly the skills possessed by lawyers are 'special skills' which the guideline recognizes could be used to facilitate or conceal a crime.") As both Mooney and Gillis testified, it was Pursley's idea in both the first and second parts of the conspiracy to disguise the funds coming into the U.S. corporations as fake stock purchases. This conduct—using his status and knowledge as an attorney to advance his crimes and to shroud his actions with a false air of legitimacy and trustworthiness—is precisely what section 3B1.3 is designed to cover.

F.   ***Pursley was the ringleader in his scheme to defraud the United States***

The Probation Office correctly assessed a four-level role enhancement Pursley as an organizer or leader in "criminal activity that involved five or more participants," pursuant to U.S.S.G. § 3B1.1(a). (PSR, ¶ 51).   A "participant" is a person who is criminally responsible for the commission of the offense, but need not have been charged or convicted. U.S.S.G. § 3B1.1, cmt. (n. 2). *See also, United States v. Boutte*, 13 F.3d 855, 860 (5th Cir. 1994) (finding that participants "need only have participated knowingly in some part of the criminal enterprise.").

10

Here, the conspiracy involved at least five participants, including the defendant, Shaun Mooney, Charles Gillis, Andrew Thomas, Andrew Mellor, and Nigel Tebay. Mooney testified to his role in the conspiracy at trial. Mooney also testified that Andrew Thomas, Andrew Mellow, and Nigel Tebay knew that Mooney was the owner, and assisted him in incorporating SES under a nominee owner and in operating the company. In this regard, Mooney's testimony is corroborated by that of Smith. Critically, these same individuals--Thomas, Mellor, and Tebay—also assisted Mooney and Pursley in the disguised repatriation of the SES funds to avoid the reporting and payment of taxes to the IRS. Andrew Thomas and Andrew Mellor also participated in the meeting in Texas to discuss the purported real estate transactions, which, as Mooney made clear in his testimony,  were actually intended to paper the file.

Gillis was also a member of the conspiracy. He testified at trial that he was not aware of the illegal nature of the conspiracy because he believed – as Pursley had told him – that the true owner of SES was Venerabile. However, taking all circumstances into account, including Mooney's testimony that he expressly told Gillis that he was operating SES from his apartment in Houston, the evidence indicates that Gillis was willfully blind to the fact that Mooney was the true owner of the company and a participant in the scheme. This is precisely why he insisted upon—and received from the government—a non-prosecution agreement prior to his testimony.

The second prong of the inquiry is whether the defendant was a leader. Factors to consider in determining whether the defendant qualifies as such include: (1) the exercise of decision-making authority; (2) the nature of participation; (3) the recruitment of accomplices; (4) the claimed right to a larger share of the fruits of the crime; (5) the degree of participation in planning or organizing the offense; (6) the nature and scope of the illegal activity; and (7) the degree of control and authority exercised over others. U.S.S.G. § 3B1.1, cmt. (n. 4). Each of these factors support the conclusion that Pursley was a leader and organizer.

As summarized above, Pursley exercised decision-making authority over the conspiracy's six-year course, he recruited participants, and he planned the offenses. Mooney testified that Pursley came up with the idea of using fake stock purchases in order to disguise the receipt of income into Pursley and Mooney's domestic corporations. It was Pursley's idea to recruit Gillis to help carry out the scheme. Pursley was the primary contact with Gillis, who testified that nearly 90% of his communication was through Pursley, and both men were integrally involved the creation of the fake stock purchase agreements and private placement memorandums that served to paper over the illegality of the scheme. (Govt. Exs. 1-9, 1-13, 1-23, 1-29, 1-44, 1-83, 1-129, 1-42, 1-56, 1-63). Pursley also went to extreme efforts to lead Smith to falsely conclude that, despite all evidence to the contrary, Venerabile was beneficial owner of SES. As revealed at trial, Pursley was integral to planning and carrying out the fraud, and he benefited commensurate with his position. Apart from Mooney, he received the second largest share of all the conspirators for his participation. Given his central role, a leader enhancement is appropriate.

IV.   **Sentencing Recommendation**

Pursley's crimes are distinguishable from run-of-the-mill tax crimes in dollar amount, sophistication, and most importantly, in premeditation. The defendant chose to commit these crimes and then took repeated actions over a six-year period, including the abuse of his status as an attorney, to execute the fraud. The sentence that he receives should reflect the seriousness of these crimes and serve to deter Pursley and others from repeating the same conduct.

A.   ***The Nature and Circumstances of the Defendant's Offenses***

The fraud and deception carried out by Pursley over the course of this six-year conspiracy warrant a guidelines sentence. Pursley knew that Shaun Mooney had not paid income taxes on the money he stashed in the Isle of Man. Instead of advising his client to come clean to the IRS, Pursley saw opportunity. He saw dollar signs. Driven by opportunism and greed, he willingly entered into an

12

agreement with his client to evade taxes, and over the course of six years, he not only repeatedly broke the law but also repeatedly violated the most basic duties entrusted to him as an attorney. He repeatedly lied to and manipulated numerous individuals. He used his position as an attorney to lead Venerabile to believe that the documents Pursley asked him to sign were legitimate. Pursley lied to Smith, ultimately convincing her that Venerabile was the owner of SES when he knew this was untrue. Pursley lied to fellow attorney Bill York about Venerabile's whereabouts, stating Venerabile had "disappeared." Pursley manipulated fellow attorney Tom Foster into signing his name to a memorandum that Pursley knew to be false. These lies and manipulation – all made easier by virtue of the fact that Pursley is an attorney – call for a guidelines sentence. Such a sentence would send a clear deterrent message not only to tax evaders, but to attorneys and other professionals who would be tempted to use their professional status for ill.

The harm to the victim in this case – the IRS – is also extensive. Not only did Pursley cheat on his personal taxes in the amount of $1,788,753, but Pursley enabled Mooney to cheat on his taxes. This created a tax liability for Mooney of $4,712,105, which was not paid until Mooney entered the OVDP. The United States' tax system relies on its citizens and residents to report timely, completely, and honestly all taxes they owe. Pursley's disregard for this basic trust is astounding, as are the lengths that he went to in order to evade taxes.

Finally, the degree of Pursley's premeditation and the amount of money involved sets his crimes apart from some other tax evaders. Pursley meticulously crafted the scheme to avoid detection by the IRS. He disguised the more than $18 million he moved from abroad on the front end, as stock purchases coming into his and Mooney's domestic corporations, and on the back end as fake loans or returns of capital that were on the surface, tax-free. These actions were not impulsive, desperate, or unintentional, but instead highly calculating and astonishing in their rapacity.

B. **The Defendant's History and Characteristics**

13

Pursley, through his background, extensive higher education, and legal training, had more advantages than most defendants who appear before this Court, and his history and characteristics should be viewed as aggravating factors. Pursley is college educated and a member of the legal profession. By the time Pursley began committing his crimes, he had his own law firm and was a successful attorney. Pursley enjoyed a life of personal and financial stability, filled with benefits that many people can never hope to receive. But that was not enough for him. He chose a different path lined with greed and deception. A path that used his education, his training, and his expertise to effectuate and hide the fraud. This portion of Pursley's history weighs in favor of a guidelines sentence, not against one.

Finally, while there certainly are cases where it can be said that a defendant's offense conduct was in some way wildly aberrant or representative of so brief and insolated a lapse in judgment that it is appropriate to give significant weight to an otherwise blameless life, this demonstrably is not such a case.  For years, Pursley led a complex tax fraud scheme designed to cheat the IRS and enrich himself and Mooney. He lied repeatedly to everyone this case touched, and signed multiple false tax returns under penalty of perjury, year after year.

C.   **The Need to Promote Respect for the Law and to Afford Adequate Deterrence to Criminal Conduct**

"[T]axes are the lifeblood of government, and their prompt and certain availability an impervious need." *Bull v. United States*, 295 U.S. 247, 259 (1935). Criminal tax prosecutions serve not only to punish the violators, but also to promote general deterrence and encourage all taxpayers to abide by the rules and pay their fair share of taxes. Recent data indicate a tax compliance rate by the general population of approximately 83.6%. *See* Internal Revenue Service, *Tax Gap Estimates for Tax Years 2011-2013*, May 2016, *https://www.irs.gov/newsroom/irs-releases-new-tax-gap-estimates-compliance-rates-remain-substantially-unchanged-from-prior-study*. This means that while many individuals comply with the

law; many others, like the defendant, shirk their taxpaying obligations. This comes at a real cost. The "gross tax gap"[3] is estimated to be $441 billion annually. *Id.* This is money that cannot be spent on education, health care, the military, or the government's myriad other obligations. Fitting the defendant's disregard for his tax obligations into this larger context demonstrates the seriousness of his offenses and the particular need to promote respect for the law.

Particularly in a matter that received local attention, the sentence should send a clear message that the choice to commit economic crimes will have serious consequences. Part of promoting respect for the law is also maintaining confidence in the justice system. This confidence is particularly undermined in a tax context by the belief that wealthy individuals can pay their way out of prison by simply paying the back taxes that they had evaded – or, of equal concern, that less wealthy individuals *believe* that the wealthy can pay their way out of prison. This perception – even if erroneous – is injurious to the system as a whole as the Fifth Circuit has noted: "Nothing is more corrosive to public confidence in our criminal justice system than the perception that there are two different legal standards – one for the powerful, the popular, and the well-connected, and another for everyone else." *United States v. Taffaro*, 919 F. 3d 947, 949 (5th Cir. 2019) (Ho, J., concurring). To maintain confidence in the justice system, it must be the case that nobody can pay his or her way out of jail and that the public understands that this is in fact the case. This is all the more true in the case of a successful attorney, such as Pursley, who engaged in cheating and deception of his clients, colleagues, and the IRS over a period of years, yet has the necessary resources to be able to satisfy any financial penalties imposed by the Court. A guidelines sentence is a significant sentence for a first-time offender. However, it clearly reflects the harm that the IRS and society at-large have suffered as a result of Pursley's and calculated fraud scheme. It is the appropriate sentence in this case.

---

[3] The gross tax gap is defined as the amount of taxes owed that are not voluntarily and timely paid.

15

The Sentencing Guidelines clearly articulate that deterrence should be the primary consideration when sentencing defendants for tax crimes. The reasoning is compelling. Because of the limited number of criminal tax prosecutions relative to the estimated incidence of such violations, deterring others from disobeying the tax laws is of the utmost importance when punishing criminal tax violations.  *See* U.S.S.G. § 2T1, introductory cmt. (2016) (explaining that, in light of "the limited number of criminal tax prosecutions relative to the estimated incidence of such violations, deterring others from violating the tax laws is a primary consideration underlying these guidelines," and that "[r]ecognition that the sentence for a criminal tax case will be commensurate with the gravity of the offense should act as a deterrent to would-be violators.").  Deterrence is particularly crucial in a case such as this where the defendant, an educated attorney, consciously and willfully violated the tax laws and assisted another in doing so. "Defendants in white collar [cases] often calculate the financial gain and risk of loss, and white collar crime therefore can be affected and reduced with serious punishment." *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006). It is this type of mentality that is most amenable to deterrence.

Absent such deterrence, other successful Americans with the means and opportunity to enrich themselves at the cost of other taxpayers, will cynically conclude that the potential rewards of such criminal activity outweigh the risks of being caught and punished for committing tax fraud.  *See United States v. Ture*, 450 F.3d 352, 358 (8th Cir. 2006) ("The goal of deterrence rings hollow if a prison sentence is not imposed."). The sentence imposed in this case should send a strong message to other would-be tax cheats that imprisonment is a reality for those who willfully violate the internal revenue laws. The sentence should also assure law-abiding taxpayers that they are not credulous rubes for filing tax returns and paying their share of taxes. In short, our nation's tax system depends of the voluntary compliance of honest taxpayers. Here, a significant sentence of imprisonment promotes voluntary compliance by making clear that there are consequences for hiding income from the government. The

16

recommended guidelines sentence will certainly deter others and send a message that cheating on your taxes and violating the trust of clients, fellow career professionals, and the IRS bears very serious consequences, and simply will not be tolerated.

      D.   **The Court should impose a within guidelines fine**

The advisory guidelines fine range, pursuant to U.S.S.G. § 5E1.2(c)(3) is a minimum of $35,000 and a maximum of $350,000. *See* PSR ¶ 91. Here, a within guidelines is appropriate. When deciding on a fine, the guidelines direct the court to consider, *inter alia*, an amount to "reflect the seriousness of the offense (including the harm to the victim and the gain to the defendant), to promote respect for the law, to provide just punishment and to afford adequate deterrence . . ." U.S.S.G. § 5E1.2(d)(1). Here, the offense is certainly serious, with an over $6 million loss to the IRS, and an over $1.7 million gain to the defendant from his crimes. The imposition of a fine, in additional to restitution, would send a strong message of deterrence that is vitally important to enforcing the honor system that is our tax code.[4]

## IV.   <u>RESTITUTION</u>

Restitution serves the purpose of making a victim whole by restoring to the victim the value of the losses suffered as a result of the defendant's crimes. As discussed above, and proven at trial, Pursley's conduct resulted in him evading $1,788,753 in federal income taxes, not including interest. Significant interest has accrued on Pursley's outstanding debt to the government, as shown in the chart below.

---

[4] The guidelines also allow the court to consider the defendant's ability to pay the fine. U.S.S.G. § 5E1.2(d)(2). Here, Pursley gained more than $1.7 million for his role in these crimes. This does not include the income that Pursley earned from RPLP as part of his deal with Mooney to move the funds back. In November 2019, Pursley sold the property he purchased in Vail for approximately $1.8 million.

|  | Tax | | Interest thru 3/8/2017 | | Interest from 3/9/2017 thru 2/29/2020 | | Total Interest | | Total Due and Owing | |
|---|---|---|---|---|---|---|---|---|---|---|
| 2007 | $ | 221,725 | $ | 84,361 | | - | $ | 84,361 | $ | 306,086 |
| 2008 | $ | 106,182 | $ | 32,683 | | - | $ | 32,683 | $ | 138,865 |
| 2009 | $ | 1,349,217 | $ | 346,112 | $ | 221,624 | $ | 567,736 | $ | 1,916,953 |
| 2010 | $ | 111,629 | $ | 23,469 | $ | 20,821 | $ | 44,290 | $ | 155,919 |
| | $ | 1,788,753 | $ | 486,625 | $ | 242,445 | $ | 729,070 | $ 2,517,823[5] | |

The government therefore respectfully requests that the Court order the defendant to pay restitution to the United States in the amount of $2,517,823, which includes interest. *See United States v. Adams,* 955 F.3d 238, 251-52 (2d Cir. 2020) (affirming inclusion of interest in restitution to IRS because the full loss to the victim included the time value of money); *United States v. Perry*, 714 F.3d 570, 577 (8th Cir. 2013) (same).

Pursley has claimed in his objections to the PSR that he filed amended tax returns for 2015 and 2016 that will result in a substantial tax refund from the IRS, and that those amounts should be credited to his restitution payment at the time of sentencing. (Doc. 245, p.7). It is the government's understanding that the amended tax returns generated large refunds, in part, due to deductions Pursley took from his law firm's Schedule C for legal expenses. It is unclear whether the defendant's claimed deductions are or are not appropriate. Given his prior conduct, Pursley is not entitled to a presumption that his tax returns are either truthful or accurate. In any case, the IRS has not processed these

---

[5] The government's calculation of interest stops on February 29, 2020. Pursley made a $700,000 bond payment to the IRS on March 9, 2017, which stopped the calculation of interest on $700,000 of Pursley's outstanding liability. Pursley also submitted a payment of $871,000 on April 8, 2020, however this did not affect the calculation of interest because the government stopped calculations prior to the submission of the payment.

amended returns and therefore Pursley is not at this point entitled to any credit. If Pursley later receives a refund, he can advise the IRS at that time to have it applied to his outstanding liability.

Pursley made a bond payment in the amount of $700,000 to the IRS on March 8, 2017, and a subsequent payment of $871,000, which posted on April 8, 2020. These payments have been applied by the IRS as credits to tax years 2010 and 2007, respectively, as designated by Pursley. However, because the IRS is unable to make an assessment on Pursley's accounts by tax year in the absence of a restitution order, neither of Pursley payments have been applied to any outstanding debts. To give Pursley credit for money that the IRS has not yet fully processed would risk the funds never being collected. Thus, we ask this Court to order restitution of the full amount of tax loss and interest – $2,517,823. Once this Court enters a restitution order, the IRS can make assessments on Pursley's accounts by tax year, in accordance with the order, and Pursley can direct the IRS to apply his prior payments (and any additional payments) to the correct years.

## V. <u>CONCLUSION</u>

For six years, the defendant conspired to undermine the U.S. tax system. He failed to pay more than $1.7 million in individual taxes and facilitated the evasion of over $4 million by his co-conspirator. Motivated by greed, he lied and manipulated to execute his carefully orchestrated crime. These serious crimes deserve serious punishment. For the aforementioned reasons, the government respectfully recommends that this Court sentence the defendant to a within guidelines sentence of 151 to 188 months, a three-year term of supervised release, a mandatory fee assessment, a fine of $35,000 to $350,000, and restitution payable to the IRS in the amount of $2,517,823. Such a sentence is appropriate in this case and consistent with the U.S. Sentencing Guidelines and the factors enumerated in 18 U.S.C. § 3553(a).

Dated:  July 13, 2020                                                    Respectfully submitted,

RYAN K. PATRICK
UNITED STATES ATTORNEY

*/s/ Grace E. Albinson*
Grace E. Albinson
Sean Beaty
Jack A. Morgan
Trial Attorney, Tax Division
U.S. Department of Justice
150 M. Street, N.E.
Washington, D.C. 20002
(202) 616-3311
Grace.E.Albinson@usdoj.gov

20

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on July 13, 2020, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF, which will serve a copy of this document on all counsel of record.

/s/ Grace E. Albinson
Grace E. Albinson
Trial Attorney, Tax Division
